**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **GERI A. KEEFE,** )<br>)<br>**Plaintiff,** )<br>)<br>v. )<br>)<br>**MEGA ENTERPRISES, INC., et al.,** )<br>)<br>**Defendants.** ) | **Judge Blanche M. Manning**<br><br>**Case No. 02 C 5156** |

## MEMORANDUM AND ORDER

Before the court is defendants Mega Enterprises, Inc., Mega Home Improvement, Trust Management Group, Steve Hogel, and Joseph Hogel's motion for summary judgment as to plaintiff's claims for sex discrimination, sexual harassment, and retaliation under Title VII, 42 U.S.C. § 2000(e). For the reasons stated below, defendants' motion is granted.

## I. BACKGROUND

### A. The Local Rules

Under Local Rule 56.1, the party moving for summary judgment must submit a statement of material facts, written in short numbered paragraphs with citations to admissible evidence. Loc. R. 56.1(a); *Smith v. Lamz*, 321 F.3d 680, 682 (7th Cir. 2003). The opposing party must respond to each paragraph by either admitting or denying the allegations, and specifically citing to supporting materials showing the existence of a genuine factual dispute. Loc. R. 56.1(b)(3)(A). In her response to defendant's Rule 56.1(a)(3) statement, plaintiff objects to at least one of the facts on "relevance" grounds, which is inappropriate. Further, in their response to plaintiff's statement of additional facts, defendants have failed to properly deny any of Keefe's assertions of fact under Rule 56.1(b)(3), and either do not respond to the asserted facts

or only dispute the "relevance" of certain facts without admitting or denying the contents. Failure to comply with the local rules governing the form of summary judgment motions is not a "harmless technicality." *Waldridge v. Am. Hoechst Corp*., 24 F.3d 918, 924 (7th Cir. 1994). When a party does not properly contest the opposing party's statement of facts, these facts are considered by the court to have been admitted to the extent that they are supported by the record. Rule 56.1(b)(3); *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1312 (7th Cir. 1995); *Tobey v. Extel/JWP, Inc*., 985 F.2d 330, 333 (7th Cir. 1993). With this caveat, the following facts are undisputed unless otherwise noted.

**B. Facts**

Mega Enterprises, Inc. is an Illinois corporation owned equally by Joe and Steve Hogel. Mega Enterprises, Inc. does business under the trade name Mega Home Improvement ("Mega"). Trust Management Group ("TMG") is defendants' commercial real estate arm. Plaintiff Geri Keefe began working for Mega in April of 1997 in a clerical position in Mega's Algonquin office. Over the course of Keefe's employment, her direct supervisor was Joe Hogel; however, Keefe called Steve Hogel for guidance in Joe's absence.

In September or October of 1999, Keefe began working with Joe Hogel at Rush Creek, which is a piece of land in Harvard, Illinois and is TMG's site office. Defendants acquired this parcel of land in order to develop it into a retail shopping area. Keefe is the only employee TMG has ever had (other than one other short-term employee) and she was placed at the Rush Creek site to make calls seeking tenants for Rush Creek. Keefe worked alone at Rush Creek.

*Geri Keefe's & Joe Hogel's Relationship*

In 1997, Keefe and Joe Hogel began a consensual sexual relationship. In May 2001, Joe

Hogel's wife, Judy Hogel first learned of Keefe's and Joe's physical relationship. That same month, Joe Hogel ended the relationship with Keefe. Keefe admits that she was sad when the relationship ended. Even after their relationship officially ended, Joe Hogel and Keefe engaged in physically intimate activities. For example, Joe would come out to the TMG office in Harvard, Illinois and kiss Keefe on the lips. Keefe responded by saying, "Joe[,] this is not a good idea." After May 2001, Joe Hogel would ask Keefe to do things in the office of a sexual nature, including indicating that he wanted her to perform oral sex. In September 2001, Joe Hogel approached Keefe after a Chicago convention, asked her to kiss him, and told her he missed her. He drove her home and made sexual advances toward Keefe in the car, including "feeling her up" and touching her breasts and vagina.

According to Joe Hogel, after he terminated his relationship with Keefe, she "showed up" at his house in June 2001 and told him she wanted to spend the night, and he said, "[n]o, get out of my house." He claims that Keefe kept calling his house, and he took the phone off the hook. Hogel testified that the day after he took the phone off the hook, he told Keefe that "the lines on the relationship just got all smudged up;" he "wanted the personal thing to stop;" and he "wanted to work in business and business only."

*Working Conditions After Geri Keefe's and Joe Hogel's Relationship Ended*

On June 22, 2001, Joe Hogel wrote a letter to Keefe, saying, "[d]o your job better than ever b4;" "[d]o not become a hassle, interruption, or make Joe H. unhappy"; and "[m]ake Joe H. uncontrollably [sic] happy. This is [sic] your 3 objectives." Joe Hogel has testified that he is uncertain about whether he actually discussed his increased expectations with Keefe prior to writing this letter. He testified that his slogan is that "employees are volunteers." Joe Hogel

3

wrote to Keefe that he would continue to employ her based on an "only up relationship" and to him, it was clear what he meant by an "only up relationship."

Keefe admits that after her relationship ended with Joe, her work duties did not change and she did not work any extra on weekends or take any more work-related phone calls on weekends than she had before the end of the relationship.

Keefe believes that Joe Hogel retaliated against her after their relationship ended, including the way in which Joe spoke to her. For example, in the summer of 2001, Joe Hogel became angry with her and told her he would rip off her head, tear out her tongue, and shit down her throat. He once returned a note, by fax, stating, "if you go over the amount I've okayed, then you're going to have to pay for it out of your pocket," without responding to the questions Keefe had faxed him. Keefe testified that Joe Hogel would have little verbal contact with her once the relationship ended.

On November 6, 2001, Keefe wrote and faxed a letter to Joe Hogel complaining about a police officer who visited her every day while she was alone at her worksite, which made her uncomfortable. Keefe had complained about this police officer to Joe Hogel in the past. He regarded the letter as "another interruption, another cry for attention," and he "did not pay attention to [it]."

*Keefe's Termination*

On November, 7, 2001, Joe Hogel fired Keefe. Hogel did not give her a specific reason as to why she was fired that day. Defendants provided her with two weeks of severance pay, continued paying her health insurance through January 2002, and, at Keefe's request, Joe Hogel wrote her a letter of reference.

*Keefe's Bonus*

Keefe claims that Joe Hogel told her that if any outlots at Rush Creek were sold, she would receive a 3% commission once the sale occurred. Joe Hogel denies that he had any such agreement to pay Keefe a commission or bonus for the sale of land. Defendants sold a piece of Rush Creek to Blockbuster Video for $150,000 in 2000. Keefe did not receive three percent of the sale, and she complained to Joe Hogel about it at the time of the sale as well as at the time of her termination.

*Rush Creek*

Overall, the Rush Creek project generated little revenue. The only lot sold during the time the Harvard office was open is the one that was sold to Blockbuster Video in late 2000 for which Keefe claims she is entitled to a 3% commission. According to Defendants, the negative economic impact of the close of the local Motorola facility and the September 11, 2001 attack led to their decision to close the Harvard office. In November 2001, Defendants terminated Jim Hogel, the owners' brother, and reduced their staff by not replacing employees who resigned. Around the same time, Defendants decided to close their "telemarketing room."

*Charges of Discrimination*

On April 17, 2002, Keefe filed a charge of discrimination against Mega and TMG. In the text of this charge, Keefe stated that she had at one time been involved in a consensual relationship with Joe Hogel, her employer. She did not, however, mention Steve Hogel in the charge. In Keefe's original EEOC charge, she claims, "I believe that I have been discriminated against in that I was sexually harassed, and retaliated against in that I was discharged by Respondent." Keefe filed her first complaint on July 19, 2002.

5

In her second EEOC charge, filed on August 30, 2002, Keefe claims, "I believe that I have been discriminated against in that I was treated differently because of my gender, I was sexually harassed, and retaliated against in that I was discharged by Respondents." On September 6, 2002, Keefe filed a third charge in which she added Joe Hogel as an individual who allegedly discriminated against her.

*Steve Hogel's and Geri Keefe's Conversations and Encounters*

Steve Hogel did not know about Geri Keefe's and Joe Hogel's relationship until after she was terminated and this lawsuit was filed. When Steve learned about the lawsuit, he called Keefe to talk with her. On October 4, 2002, Steve Hogel asked Keefe if he could come to her house because they "really needed to talk." Steve explained to Keefe that he wanted to talk to her in person because he could not find out what happened and how the lawsuit arose over the phone. Steve went to Keefe's house to talk to her about her charge and complaint.

Their conversation lasted about an hour. According to Keefe, Steve Hogel told her that he was sad about the lawsuit and that he hoped she would change her mind. Keefe told Steve Hogel that she "didn't mean for it to be against [him]" and he responded that it was because he worked with Joe at Mega. Plaintiff testified that Steve's tone later became angry and that Steve told Keefe that if she did not drop her lawsuit, Joe could slap her with a lawsuit and she would be left with nothing. According to Keefe, after this meeting she called her attorney to tell him to drop the lawsuit because she was afraid of Steve.

Joe and Steve Hogel subsequently discussed what they would do next and how they would make sure Keefe had, in fact, dropped the lawsuit. Steve said that while he was at Keefe's house, she contacted her lawyer, said that she would email Joe based on the conversation, and

6

said that she would send a letter saying she was dropping everything.  Joe Hogel testified that he never spoke with Steve about contacting Keefe prior to Steve's doing so.

On the same day that Steve came to her house, Keefe typed a letter to her attorney dated October 7, 2002.  After Steve met with Keefe, he called to ask her if she had, in fact, sent the letter to her attorneys directing them to dismiss the lawsuit.  Keefe sent the letter to her attorney three days later.  On October 8, 2002, Keefe sent an email to Joe and Judy Hogel apologizing for filing the lawsuit and attached a letter that she sent to her attorney asking him to drop the case.[1]

Thereafter, Steve Hogel went to a restaurant where Keefe worked.  Keefe confronted Steve, who said, "wow, this whole thing is back up again."  Keefe and Steve set up a time to meet at another restaurant.  According to Steve, at this time Keefe was "a little bit more bitter."  At their meeting, Steve told Keefe, "you know what, I would make this go away for $2,000, okay?"  Keefe never made any attempts to contact Steve or left any messages for him, from the time he went to her house until the last conversation they had.  On November 6, 2003, Keefe filed her second amended complaint, adding Steve Hogel as a defendant.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper when the "pleadings, deposition, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of any material fact." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party opposing the summary judgment motion may not rest upon the mere allegations or denials of the adverse party's pleading; rather, it must respond with "specific facts showing that there is

---

[1] Given that the court is considering this motion for summary judgment, Keefe ultimately did not drop the lawsuit.

a genuine issue for trial." Fed.R.Civ.P. 56(e). This court must evaluate the evidence supporting the summary judgment motion in a light most favorable to the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). With these standards in mind, the court turns to defendants' motion for summary judgment to determine whether they are entitled to judgment as a matter of law. *See Johnson v. Gudmundsson,* 35 F.3d 1104, 1112 (7th Cir. 1994).

## III. DISCUSSION

As an initial matter, the court notes that to the extent Keefe is attempting to hold Joe and Steve Hogel liable under Title VII in their individual capacities, she cannot do this. *Gastineau v. Fleet Mortgage Corp.*, 137 F.3d 490, 493 (7th Cir. 1998). Thus, the Title VII claims against Joe and Steve Hogel are dismissed.

### A. Sex Discrimination (Count I)

The court notes that neither the Second Amended Complaint ("SAC") nor the briefing on the motion for summary judgment are models of clarity. The Plaintiff's SAC alleges "discriminatory conduct" (Count I) and retaliation (Count II). In their motion for summary judgment, defendants offer arguments against claims of sexual harassment, different treatment, retaliation and plaintiff's entitlement to a bonus. Plaintiff sought to file a surreply[2] stating that

> [m]erely because the Defendant characterizes the Plaintiff's complaint as including more, or different, claims than what Plaintiff has actually brought, does not make it so. The Plaintiff did not bring separate claims for sexual harassment, different treatment, retaliation and bonus. Those claims are all part of her discrimination claim and should be treated as such.

Generally speaking, a plaintiff cannot bring claims in a lawsuit that were not included in

---

[2]Although this court initially denied plaintiff's motion for leave to file a surreply, the court reconsiders the denial and grants plaintiff's motion to file a surreply.

her EEOC charge. *Cheek v. W. and S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir.1994) (citing *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47 (1974)). Plaintiff's last EEOC charge filed on September 6, 2002 states that "I believe that I have been discriminated against in that I was treated differently because of my gender, I was sexually harassed, and retaliated against in that I was discharged by Respondents in violation of title VII of the Civil Rights Act of 1964, as amended."

Based on this EEOC charge, the court will address plaintiff's claim for sex discrimination (including a claim that she was denied a bonus because of her gender), sexual harassment, and, in Count II, her claim of retaliation.

*Termination*

Keefe alleges that she was terminated by defendants because of her refusal to continue a personal relationship with Joe Hogel. Under Title VII it is unlawful for any employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2. An employee alleging sex discrimination may proceed by presenting direct evidence of discriminatory intent or by using the indirect (i.e., *McDonnell Douglas* burden-shifting) method. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973).

"To prove discrimination via direct evidence 'essentially requires an admission by the decision-maker that his actions were based on the prohibited animus.'" *Jordan v. City of Gary*, No. 03-3772, 2005 WL 182412, at *4 (7th Cir. Jan. 28, 2005) (citation omitted). Because such direct evidence is often difficult to come by, "a plaintiff may also 'prevail under the direct

9

method of proof by constructing a 'convincing mosaic' of circumstantial evidence that 'allows a jury to infer intentional discrimination by the decision-maker.'" *Id*. (citations omitted).

Under the indirect method, Keefe must establish a prima facie case of sex discrimination by demonstrating that: (1) she is a member of a protected class; (2) she was performing her job satisfactorily; (3) she suffered an adverse employment action; and (4) at least one similarly situated employee, not in her protected class, was treated more favorably. *Wyninger v. New Venture Gear, Inc.,* 361 F.3d 965, 978 (7th Cir. 2004). If the plaintiff proves her prima facie case, then "it is incumbent upon the defendants . . . to counter with a legitimate, nondisciminatory and nonpretextual reason for the employment action." *Jordan,* No. 03-3773, at *5. As in any Title VII action, the ultimate burden of persuasion remains on the plaintiff to show that the employer intentionally discriminated against her. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507 (1993).

Keefe makes no argument that direct evidence of discrimination exists. Accordingly, the court will analyze the claim for sex discrimination under the *McDonnell-Douglas* test. Keefe fails to establish the fourth element of a prima facie case of sex discrimination. Although Keefe alleged in her SAC that she was "treated differently than other employees of the firm . . . on the basis of [her] gender," she does not provide this court with any evidence of a similarly situated employee who was treated more favorably than she.[3]

To establish that another employee is similarly situated, Keefe must show that there is someone who is directly comparable to her in all material respects. *See Patterson v. Avery*

---

[3]While Keefe was apparently the only employee TMG ever had (other than another short term employee who was there for just a few months), defendant Mega Enterprises, Inc. (TMG was Mega Enterprises, Inc.'s commercial real estate arm) had other employees.

*Dennison Corp.,* 281 F.3d 676, 680 (7th Cir. 2002). To determine whether employees are directly comparable, the court looks to relevant factors, including whether the employee: (1) held the same or similar job; (2) was subject to the same standards; (3) was supervised by the same person; and (4) had comparable experience, education, and other qualifications. *See Ajayi v. Aramark Bus. Serv., Inc.*, 336 F.3d 520, 532 (7th Cir. 2003).

Keefe has not provided any information of evidentiary quality, *i.e.,* depositions, answers to interrogatories, admissions on file, or affidavits, that fulfill these criteria. *See Celotex Corp.*, 477 U.S. at 322. As such, Keefe has not established that one of her co-workers was similarly situated in the first instance, let alone that a similarly-situated employee was treated more favorably than she. Because Keefe has failed to establish a prima facie case of sex discrimination, the court grants defendant's motion for summary judgment as to this aspect of Count I of the Complaint.

*Sexual Harassment*

Plaintiffs can establish a violation of Title VII by proving that "discrimination based on sex has created a hostile or abusive work environment." *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 66 (1986). For sexual harassment to be actionable, however, it must be "so severe or pervasive as to alter the conditions of employment and create an abusive working environment." *Hottenroth v. Village of Slinger*, 388 F.3d 1015, 1034 (7th Cir. 2004) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998)). "The workplace that is actionable is one that is hellish." *Rogers v. City of Chicago*, 320 F.3d 748, 752 (7th Cir. 2003).

In evaluating whether a work environment is hostile based on sexual harassment, a plaintiff must establish that: (1) she was subjected to unwelcome sexual harassment; (2) the

harassment was based on her sex; (3) the sexual harassment unreasonably interfered with her work performance by creating an intimidating, hostile, or offensive work environment that affected the psychological well-being of the plaintiff; and (4) there is a basis for employer liability. *See McPherson v. City of Waukegan*, 379 F.3d 430, 437-38 (7th Cir. 2004).

Defendants argue that Keefe cannot succeed on her claim of sexual harassment because Keefe has not alleged that Hogel's conduct "altered her ability to do her job," pointing to the fact that Keefe alleged in her complaint that her job performance "continued at substantially the same level or better" subsequent to the termination of the relationship between Joe Hogel and Keefe.

In her response to defendants motion for summary judgment, Keefe, however, makes no argument in response to defendants' assertion that they should be granted judgment on the sexual harassment claim as a matter of law. "Employment discrimination cases are extremely fact-intensive" and the court is not "'obliged to scour the record looking for factual disputes.'" *Greer v. Board of Educ. of the City of Chicago*, 267 F.3d 723, 727 (7th Cir. 2001) (citation omitted). Instead, plaintiff "must present definite, competent evidence in rebuttal" if she wishes to successfully oppose defendants' motion. *Salvadori v. Franklin Sch. Dist*., 293 F.3d 989, 996 (7th Cir. 2002). Here, plaintiff has made no effort to rebut defendants' argument as to the sexual harassment claim or point to any evidence relating to the defendants' argument.

However, upon consideration of the material facts as submitted by the parties, as well as certain other parts of the record, the court concludes that defendants are entitled to judgment as a matter of law as to Keefe's claim of sexual harassment. Keefe has set forth sufficient evidence establishing the first (that she was subjected to unwelcome sexual harassment) and fourth (that there is a basis for employer liability) elements of a hostile work environment claim.

Specifically, Keefe testified that during her employment with TMG but after Joe Hogel had ended their consensual physical relationship, Hogel made it "apparent" that he wanted a sexual relationship with her and that it "made her very uncomfortable" and that she "didn't want to do anything." For example, Keefe testified that Hogel kissed plaintiff on the lips to which plaintiff responded by saying that "it was not a good idea. We are gonna get caught. This is not–we can't do this." He also would visit her at her office and indicate that he wanted her to perform oral sex by sitting back in his chair, separating his legs, putting his hand on his crotch and saying "come on over here."

Keefe also testified that while she attended a convention at a hotel in Chicago, Hogel had approached her at the convention and they went to a bar. At the bar, Hogel "asked me to kiss him, [said] that he missed me, and then he offered to drive me home, and then I got in the car with him and we drove home." Keefe further testified that on the way, Hogel "made advances" towards Keefe, "felt her up" and touched her breasts and vagina. Keefe testified that in response to Hogel's advances, she again stated that "this is not a good idea" and "we cannot do this."

Keefe further testified that on the drive home from the hotel, "[Joe Hogel's] wife had made a phone call on the phone, and he said, 'Yes, I'm on my way home.' And when he hung up the phone, I said, 'you can't do this. We can't have this relationship.'" Hogel's remarks and conduct were sexual in nature. In addition, under the fourth element, Mega is strictly liable for Hogel's conduct because he was a supervisory employee. *See McPherson,* 379 F.3d at 438.

Thus, the court is left with the questions of whether the behavior by Hogel was based on Keefe's gender under the second prong and whether Keefe has established that a hostile work environment existed under the third prong. Because Keefe's claim fails under the third prong, it

13

need not address the second prong.

As to the third prong, a plaintiff can establish that a hostile work environment existed if the conduct she was subjected to was so severe or pervasive that it altered her employment conditions and created an abusive working environment. *See id.* (citations and quotations omitted). To qualify as hostile, the work environment must be objectively and subjectively offensive, that is, it must be a work environment that a reasonable person would find hostile or abusive, and one that the victim in fact perceived to be hostile or abusive. *See id.* (quotations and citations omitted).

Keefe has not put forth any evidence that she perceived the work environment to be hostile or abusive as a result of the sexual harassment. Indeed, the deposition testimony by Keefe indicates that the main reason she was stating that "we cannot do this" was due to her concern that she and Hogel would be caught and that their physical relationship could hurt his wife, Judy, not because she found the conduct hostile or threatening. Specifically, in her deposition testimony, Keefe stated that she was not surprised that Joe Hogel ended their physical relationship because she was friends with his wife, Judy, and their two sons. Keefe dep. at 149 ("I, myself, being friends with Judy and Joe knew that it eventually had to end. . . Q: So were you feeling bad that you were also having an affair with her husband and their father? A: Yes. Q: So you weren't surprised. Were you sad that the relationship was ending? A: Yes.").

The record supports the conclusion that Judy Hogel and Keefe were quite friendly. For example, Judy Hogel had offered to let Keefe stay in the Hogels' home in or around 1998 and Keefe and her daughter lived with the Hogels for three months rent-free. The Hogels also lent Keefe money through Mega so that she could pay bills, and Judy Hogel also purchased

14

groceries, school supplies and groceries for Keefe and her daughter. In addition, Keefe and her daughter accompanied the Hogels on some family vacations and the Hogels also hosted a birthday party for Keefe's daughter one year. The court cites to this evidence only to show the extent of the friendship between Judy Hogel and Keefe in support of its conclusion that Keefe indicated that she did not want to continue the relationship with Joe Hogel because of her friendship with Judy, and not because she found Hogel's conduct to be threatening. Indeed, the record is devoid of any evidence that Joe Hogel's sexual advances subsequent to the termination of their physical relationship altered Keefe's working conditions and created a hostile or abusive working environment. Because Keefe has not provided sufficient evidence to fulfill the elements of a hostile work environment claim based on sexual harassment, the court grants defendant's motion for summary judgment as to the sexual harassment aspect of Count I.

*Bonus Claim*

Defendants argue that Keefe's discrimination claim based on a bonus that she contends was due her from the sale of a Rush Creek lot in 2000 is time-barred and that they are, therefore, entitled to summary judgment on the issue. Once again, plaintiff has completely failed to address this argument in her response brief, and has offered no evidence in rebuttal. The court concludes that plaintiff's claim of discrimination based on the failure to pay a bonus is time-barred.

A plaintiff must file a charge of discrimination with the EEOC or appropriate state agency within 300 days after the "alleged unlawful employment practice." *Sharp v. United Airlines, Inc.*, 236 F.3d 368, 372 (7th Cir. 2001). The 300-day limit begins to run "when the defendant has taken the action that injures the plaintiff and when the plaintiff knows she has

been injured … 'not when [she] determines that the injury was unlawful.'" *Id*. (quoting *Thelen v. Marc's Big Boy Corp*., 64 F.3d 264, 267 (7th Cir. 1995)).

Keefe claims that defendants' unlawful employment practice is their failure to give her the 3% bonus that she alleges became due to her upon the sale of the Blockbuster lot in late 2000. Joe Hogel allegedly took the action that "injured" Keefe when he failed to pay her at the time the bonus was due. At that time, Keefe was aware that she had been injured; therefore, the 300-day period began the day the bonus became due in late 2000. Keefe did not, however, file her first charge until April 17, 2002, well over 300 days after the injury occurred. Therefore, Keefe's bonus claim is time-barred and defendants are entitled to summary judgment on this issue.

### B. Retaliation (Count II)

Although Plaintiff states in her EEOC charge that she was retaliated against by being terminated by Joe Hogel because their relationship ended, in the SAC, Keefe alleges that "[t]he conduct of *Steve Hogel* as described above was in retaliation for the filing of this suit and for the filing of plaintiff's Charges of Discrimination . . . [] and in retaliation for plaintiff's conduct in opposing a practice that is unlawful; and/or because plaintiff has made a charge . . . under Title VII." SAC at ¶36 (emphasis added). Under either scenario, her claims of retaliation fail.

As to the claim of retaliation against Steve Hogel, defendants contend that the claim of retaliation against Steve Hogel should be dismissed because Keefe failed to include her claim of retaliation against Steve Hogel in her EEOC charge and within 300 days after the events occurred, as required by statute. The court does not agree. In addition to allegations in the administrative charge, Title VII cases can include claims that are "like or reasonably related to

16

the allegations of the charge and growing out of such allegations." *Jenkins v. Blue Cross Mut. Hosp. Ins.*, 538 F.2d 164, 167 (7th Cir. 1976). These permissible related claims specifically include retaliation for the filing of a charge. *Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1312 (7th Cir. 1989), *superseded on other grounds by statute, Rush v. McDonald's Corp*., 966 F.2d 1104, 1111 (7th Cir. 1992). The practical reason behind treating retaliation claims in this manner is that plaintiffs who have been retaliated against for filing an administrative charge will be reluctant to file a second charge complaining about the retaliation. *Id*. In short, a separate administrative charge is not a prerequisite to a retaliation claim for filing the first charge. *Id*.; *Steffen v. Meridian Life Ins. Co*., 859 F.2d 534, 545 n.2 (7th Cir. 1988). The alleged incidents that Keefe argues constituted retaliation by Steve Hogel occurred in October of 2002, but Keefe's three EEOC charges were filed between April 17 and September 6, 2002. Thus, because the alleged retaliation by Steve Hogel occurred after the filing of Keefe's EEOC charges, her failure to file a separate administrative charge for the retaliation claim against Steve Hogel is not fatal to her claim.

In any event, Keefe's retaliation claim against Steve Hogel claims fails on the merits. Former employees are protected under the retaliation section of the Civil Rights Act of 1964. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997). Keefe's claim of post-termination retaliation by Steve Hogel will only survive a motion for summary judgment, however, if the alleged post-termination acts of retaliation have a nexus to her employment or impinge on her future employment prospects. *Veprinsky v. Fluor Daniel, Inc*., 87 F.3d 881, 888, 892-94 (7th Cir. 1996) (stating that the following actions could be actionable as post-termination retaliation: plaintiff's claim that former employer did not rehire him because of his pending action for

17

discrimination; former employer's disclosure of the plaintiff's pending action to a placement firm, which no longer submitted plaintiff's resume to potential employers; and the former employer's disclosure of false information about the plaintiff to new employer).

Here, Keefe claims that the nexus between Steve Hogel's retaliation and her future employment is that he attempted to intimidate her into dropping her Title VII claim, which, if she were successful, could allow her to obtain reinstatement as a remedy. But Keefe did not drop her lawsuit and she does not seek reinstatement as a remedy. Unlike the plaintiff in *Veprinksy,* Keefe has not demonstrated any interest in working for defendants again. Furthermore, Keefe has not put forth any evidence that Steve Hogel's actions have impeded her future employment opportunities. Accordingly, because Keefe has not shown that there is a nexus between Steve Hogel's action and her employment or future employment prospects, defendants' motion for summary judgment on Keefe's post-termination retaliation claim is granted.

As to the claim of retaliation against Joe Hogel, there are two ways in which a plaintiff may pursue a retaliation claim. *Stone v. City of Indianapolis Pub. Utils. Div.,* 281 F.3d 640, 644 (7th Cir. 2002). Under the first method, the plaintiff must present direct evidence of a statutorily protected activity, an adverse employment action, and a causal connection between the two. *See Haywood v. Lucent Tech., Inc.*, 323 F.3d 524, 531 (7th Cir. 2003). Under the indirect method, an employee may establish a prima facie case of retaliation by showing that: (1) she engaged in statutorily protected activity; (2) she performed her job satisfactorily; (3) despite her satisfactory job performance, she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity.

18

*See Haywood*, 323 F.3d at 531

Keefe has not presented any direct evidence that the adverse employment action of which she complains (her termination) was causally connected to the statutorily protected activity in which she was engaged (refusing to continue her relationship with Joe Hogel). Under the indirect method, Keefe's claim also fails because she failed to present any evidence of the fourth prong of the prima facie test–that she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. Accordingly, Keefe has failed to establish a prima facie case of retaliation, and thus the court grants defendants' motion for summary judgment as to Count II.

### IV. CONCLUSION

For the foregoing reasons, the court grants defendants' motion for summary judgment as to Counts I and II. Judgment is entered against the plaintiff.


**ENTER:**

/s/ Blanche M. Manning
**Blanche M. Manning**
**United States District Court Judge**


**DATE:** March 23, 2005